# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| COASTAL RANCHES CONSERVANCY,<br>        Plaintiff,<br><br>        v.<br><br>TONY TAVARES, in his official capacity as Director of the California Department of Transportation,<br>        Defendant. | 2:24-cv-00468-DSF-RAOx<br><br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came before the Court for a bench trial on October 7 and October 8, 2025.  The parties subsequently filed post-trial briefs in favor of their positions.[1]  After hearing the testimony and reviewing the evidence and argument, the Court now finds as follows:

---

[1] While the Court's trial findings were under submission, the National Marine Fisheries Service issued a Biological Opinion and Incidental Take Statement (BO/ITS) regarding the project at issue in the second cause of action in this case.  The Court has dismissed the second cause of action in a separate order.

## I. Findings of Fact

1.  The Southern California Steelhead (steelhead) is a salmonid species that has been listed as endangered under the federal Endangered Species Act (ESA) since 1997.  Allen Decl. (Dkt. 118) ¶ 13.

2.  Steelhead are an anadromous species that return from the sea into freshwater rivers and streams in order to spawn.  Fish of the same species, *Oncorhynchus mykiss* (*O. mykiss*),[2] that remain resident in freshwater for their entire lifecycle are known as rainbow trout.  Id. ¶¶ 14; 29-30.

3.  Adult steelhead sightings in the Southern California region are rare.  Id. ¶¶ 20-24.

4.  Resident rainbow trout and steelhead can interbreed.  Whether the resulting fry are steelhead or resident trout cannot be determined until maturity.  DeVries Decl. (Dkt. 124-1) ¶ 35.

5.  The freshwater body at issue in this case, Gaviota Creek in Santa Barbara County, California, historically and currently provides habitat and spawning grounds for steelhead.  See, e.g., Allen Decl. ¶¶ 23, 28, 38-39, 45.

6.  However, recent sightings of steelhead in Gaviota Creek are very rare.  Id. ¶ 24.

7.  Numerous barriers, both natural and manmade, inhibit free upstream passage of some or all steelhead in Gaviota Creek.[3]

---

[2] The Court will use "steelhead," "juvenile steelhead," and "resident trout" when referring to those subgroups individually and "*O. mykiss*" when not differentiating among the subgroups.

[3] The Court refers to the Caltrans structures as "barriers" for ease of reference, not necessarily as a judgment on their effect on the movement of *O. mykiss*.

2

8.  With one exception,[4] the manmade barriers in Gaviota Creek are owned and maintained by the California Department of Transportation (Caltrans) as part of U.S. Highway 101.  Fourteen Caltrans barriers are at issue in the case.

9.  The two most relevant natural barriers in Gaviota Creek are the so-called "Bedrock Chute" and "Boulder Jam."

10.  The Bedrock Chute is composed of two steep, narrow, smooth slopes with a resting pool in the middle.  DeVries Decl. ¶¶ 64-65.  The structure of the Bedrock Chute results in high velocity water flow over a narrow shallow surface, which is very difficult for fish to pass.  Id.

11.  The Boulder Jam is an eight-foot-high barrier with a bedrock ledge and no plunge pool at the base.  Id. ¶ 66.  Any fish attempting to go upstream of the Boulder Jam must make a very high jump without the benefit of a pool in which to rest and launch the jump.  Id. ¶¶ 66-69.

12.  These two natural barriers lie between four Caltrans barriers downstream and ten Caltrans barriers upstream.  See Ex. 208.

13.  Adult steelhead, juvenile steelhead, and resident trout have differing abilities to overcome barriers in a stream.  See generally Allen Decl. ¶¶ 142-151.

14.  When analyzing the passability of the various barriers in Gaviota Creek, Plaintiff's expert, Mark Allen, utilized jump heights based on fish passageway criteria.  DeVries Decl. ¶ 39 (unrebutted).

15.  The use of passageway criteria does not necessarily provide the most relevant estimate of jumping ability because passageway

---

[4] The barrier referred to as GA_14 is a utility crossing over Caltrans's right of way.  There is some dispute about the degree of control that Caltrans may have over this crossing.  Given the Court's findings, it is unnecessary to resolve this dispute and the Court will refer to the utility crossing as if it were a Caltrans-owned barrier.

construction seeks to provide easy paths for fish, not merely manageable ones.  See DeVries Decl. ¶¶ 39-44.

16. Testimony from both Allen and Defendant's expert, Paul DeVries, indicate that adult steelhead can jump well in excess of the two feet used by Allen in his calculations.  Allen testified that an adult steelhead can jump over five feet "in the right conditions."  Tr. 160:3-5.  DeVries testified that "a 5- to 8-foot leap is not uncommon" for an adult steelhead.  Tr. 424:13-17.

17. Based on that testimony, a reference jumping height of 4 to 5 feet for an adult steelhead is more appropriate than the two feet used by Allen.

18. Based on the information presented by Allen in Trial Exhibit 53, all of the Caltrans barriers other than the two culverts would be passable with a five-foot jump and all of the Caltrans barriers other than the culverts would be passable under favorable conditions with a four-foot jump.

19. Further, it is uncontroverted that any steelhead capable of passing the Boulder Jam would be almost certainly capable of surmounting all of the Caltrans manmade barriers between the natural barriers and the Las Canovas Culvert.

20. There is insufficient evidence to conclude that the cumulative effect of the Caltrans non-culvert barriers either meaningfully discourages or directly harms steelhead when moving upstream in Gaviota Creek.  Plaintiff's evidence on this point is speculative, and steelhead are known to migrate substantially longer distances over many more barriers.  See Tr. 424:24-426:4 (DeVries).

21. Very little testimony was provided regarding the jumping abilities of juvenile steelhead and adult resident trout beyond the passageway construction guidelines used by Allen.  What evidence there is suggests that both juvenile steelhead and adult

residents can jump at least one foot and probably more.  <u>See</u> Allen Decl. ¶¶ 144-148.

22. However, even assuming a two-foot jump height, several Caltrans barriers inhibit upstream movement for juvenile steelhead and resident trout.  All but one of the Caltrans barriers inhibit upstream movement if a one-foot jump height is used.  <u>See</u> Exhibit 53.

23. It is uncontroverted that juvenile steelhead and adult resident trout cannot pass upstream of the Boulder Jam.

24. It is probable that juvenile steelhead and adult resident trout cannot pass upstream of the Bedrock Chute.

25. It is uncontroverted that there is a population of resident trout already existing above the Boulder Jam.

26. Even if juvenile steelhead and resident trout cannot pass back and forth over the Boulder Jam, the upstream Caltrans barriers prevent fish already above the Boulder Jam from moving upstream above the Boulder Jam.

27. Juvenile steelhead and resident trout can benefit from being able to move up and downstream in response to stream conditions such as heat, food availability, and flow strength.  <u>See</u> Allen Decl. ¶¶ 103-106.

28. However, Plaintiff provided insufficient evidence for the Court to conclude that the benefit to juvenile steelhead and resident trout of being able to move upstream over the non-culvert barriers translates into an actual meaningful impact to the steelhead population.

29. While the Court appreciates that direct observation of *O. mykiss* in varying Gaviota Creek conditions could be difficult and resource intensive, Plaintiff has failed to provide an adequate assessment of the conditions between the Caltrans barriers.

30. For example, there is no evidence to indicate that certain parts of Gaviota Creek are lacking in quality deep pools, but adjacent areas upstream have pools that could be accessed if it were not for the Caltrans barriers.

31. Nor is there evidence that some parts of Gaviota Creek have minimal food availability but adjoining food-rich areas cannot be accessed due to the Caltrans barriers.

32. In the absence of this type of evidence, the Court is left with no way to conclude that movement of *O. mykiss* within the areas impeded by the Caltrans barriers would have an actual, substantial impact on the population.

33. It is also uncontroverted that Gaviota Lagoon remains in a relatively natural state, albeit substantially reduced from its original size by human activities. Plaintiff acknowledges that Gaviota Lagoon provides high quality rearing habitat for juvenile steelhead. Allen Decl. ¶¶ 124-131.

34. Plaintiff has failed to establish that Gaviota Lagoon and the interrupted stretches of Gaviota Creek downstream of the culverts fail to provide sufficient amounts of reasonably high quality habitat for resident trout and juvenile steelhead, especially given the very low number of steelhead currently in Gaviota Creek or likely to be resident in Gaviota Creek in the foreseeable future.

35. It is uncontroverted that the two Caltrans culverts are impassable to all adult steelhead, juvenile steelhead, and resident trout.

36. Therefore, the entire Gaviota Creek watershed upstream of those culverts is inaccessible to adult steelhead and to any juveniles or resident trout not already above the culverts.

37. However, there is little evidence from which to conclude that access to the habitat upstream of the culverts would have a meaningful impact on the steelhead population.

6

38. Plaintiff speculates that the headwaters of Gaviota Creek above the Giorgi Culvert contain high-quality habitat, but access to the private landholdings in the area is "highly restricted" and no evidence of the actual current conditions is in the record. See Allen Decl. ¶¶ 51-54.

39. There is some evidence that Las Canovas Creek upstream of the Las Canovas Culvert contains potentially good steelhead and resident trout habitat. See Allen Decl. ¶¶ 58-60. However, Plaintiff submitted very little evidence on this point, and the Court cannot conclude that access to the creek would provide a meaningful benefit to the steelhead population.

40. Plaintiff's expert conducted a "short inspection" of Las Canovas Creek "just upstream" of the Las Canovas Culvert, but from this he concluded only that the creek "appeared to possess the qualities" needed for spawning and rearing of *O. mykiss*. Id.

41. There is little evidence that Las Cruces Creek or the West Fork of Gaviota Creek would provide meaningfully helpful habitat for steelhead or resident trout populations.

42. Plaintiff's expert concedes that, if accessible, Las Cruces Creek would likely be "low quality" steelhead habitat. Allen Decl. ¶ 71.

43. While the West Fork can provide moderate to high quality habitat seasonally, Plaintiff's expert concedes that the West Fork is subject to intermittent flows and goes dry for part of the year. Allen Decl. ¶¶ 62-74.

44. The Court accepts that access to the West Fork could be marginally helpful to the *O. mykiss* population, all other things being equal, but it is  not convinced that access would make a significant difference to that population.

7

## II. Conclusions of Law

1. It is unlawful under the ESA to "take" an endangered species listed under the Act.  16 U.S.C. § 1538(a)(1)(B).

2. "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

3. "Harm" to a species includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.

4. "[A] citizen-suit plaintiff must prove that the injury to identifiable members of the protected species is of a type covered by the ESA and that the relationship between the challenged activity and the injury meet the standards of proximate causation."  Cascadia Wildlands v. Scott Timber Co., 105 F.4th 1144, 1156 (9th Cir. 2024).

5. It is not necessary that the degraded or destroyed habitat be "essential" to the survival of the listed species.  Id. at 1157.  The requirement is "that the habitat be *significantly* modified or degraded, and that the modification or degradation *significantly* impair the species' *essential* behavioral patterns."  Id. (emphasis in original).

6. Consistent with the above findings of fact, the Court concludes that the Caltrans barriers do not significantly impair the essential behavioral patterns of adult steelhead.

   a. Using an appropriate jump height of four to five feet, the Caltrans barriers downstream of the culverts are passable by adult steelhead under most flows.

   b. In addition, the natural barriers in Gaviota Creek, especially the Boulder Jam, are the most salient barriers to adult steelhead passage.  Any adult steelhead capable of

passing the Boulder Jam will be able to pass any Caltrans barrier downstream of the culverts.

    c.  Any cumulative harm to adult steelhead from the need to pass the Caltrans barriers is speculative and unlikely to be significant based on the record before the Court.

    d.  The Caltrans culverts completely impede the passage of all steelhead.  However, Plaintiff failed to establish that lack of access to the habitat upstream of the culverts significantly impairs the steelhead population in Gaviota Creek or in Southern California more generally.

7.   Consistent with the above findings of fact, the Court concludes that the Caltrans barriers do not significantly impair the essential behavioral patterns of juvenile steelhead or resident trout.

    a.  The natural barriers completely impede passage of juvenile steelhead and all resident trout.  Therefore, Caltrans barriers upstream of the natural barriers are irrelevant to any juveniles or resident trout already living downstream of the natural barriers.

    b.  The Caltrans barriers may be detrimental to juvenile steelhead and resident trout by impeding those fish from freely moving up and downstream in response to cooling needs or differences in food availability.  However, the evidence on this point lacked detail and was largely hypothetical.  The Court cannot conclude that any disruption of movement within Gaviota Creek by the Caltrans barriers *significantly* impairs the ability of juvenile steelhead and resident trout to engage in essential behavioral patterns, such as eating and cooling.

8.   Overall, while the Caltrans barriers may be less ideal for the *O. mykiss* population than an entirely natural, unimpeded Gaviota Creek would be, Plaintiff has not established that the barriers

have a significant, non-hypothetical, real-world impact on *O. mykiss* essential behavioral patterns.

9. Therefore, the Court finds Caltrans not liable for the alleged violation of 16 U.S.C. § 1538 stated in the first cause of action in this case.

IT IS SO ORDERED.

Date: May 21, 2026

_____
Dale S. Fischer
United States District Judge

10