Name **Erica A. Maharg, SBN 279396**

Address **8 Rio Vista Ave.**

City, State, Zip **Oakland, CA 94611**

Phone **510-473-8793**

Fax _____

E-Mail **eam@atalawgroup.com**

☐ FPD    ☐ Appointed    ☐ CJA    ☐ Pro Per    ☒ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL RANCHES CONSERVANCY <br><br> PLAINTIFF(S), <br><br> v. <br><br> TONY TAVARES, in his official capacity as Director the California Department of Transportation <br> DEFENDANT(S). | CASE NUMBER: <br><br> 2:24-CV-00468-DSF-RAO <br><br><br> **NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that _____ Coastal Ranches Conservancy _____ hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

## Criminal Matter

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

## Civil Matter

☒ Order (specify):
Order DISMISSING Plaintiff's Second Cause of Action, ECF No. 163 (Attachment 2)
FINDINGS OF FACT AND CONCLUSIONS OF LAW, ECF No. 165 (Attachment 3)

☒ Judgment (specify):
Judgment, ECF No. 166 (Attachment 4)

☐ Other (specify):

Imposed or Filed on _____ May 21, 2026 _____. Entered on the docket in this action on May 21, 2026 _____.

A copy of said judgment or order is attached hereto.

_____        /s/ Erica A. Maharg
Date                                Signature
                                    ☐ Appellant/ProSe    ☒ Counsel for Appellant    ☐ Deputy Clerk

**Note:**    The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

# ATTACHMENT 1

## Attachment 1

## Representation Statement

**Appellant: Coastal Ranches Conservancy**

ERICA A. MAHARG (Bar No. 279396)
Email: eam@atalawgroup.com
THERESA TRILLO (Bar No. 349989)
Email: tt@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94611
Telephone: (510) 473-8793

Daniel Cooper (Bar No. 153576)
Email: daniel@sycamore.law
SYCAMORE LAW
1004 B O'Reilly Street
San Francisco, CA 94129
Telephone: (415) 360-2962

**Appellee: Tony Tavares, in his official capacity as Director of the California Department of Transportation**

ERIN HOLBROOK, Chief Counsel
G. MICHAEL HARRINGTON, Deputy Chief Counsel
LUCILLE Y. BACA, Assistant Chief Counsel
ALINA STARK, Attorney Supervisor
ABIGAIL FISH (SBN 347325)
HUNTER W. COLLINS (SBN 352599)
111 Grand Avenue, Suite 11-100, Oakland, CA 94612
MAIL TO: PO BOX 24325, Oakland, CA 94623-1325
Telephone: (510) 433-9100
Facsimile: (510) 433-9167

# ATTACHMENT 2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL RANCHES CONSERVANCY,<br>    Plaintiff,<br><br>             v.<br><br>TONY TAVARES, in his official capacity as Director of the California Department of Transportation,<br>    Defendant. | 2:24-cv-00468-DSF-RAOx<br><br>Order DISMISSING Plaintiff's Second Cause of Action |

This matter was tried before the Court on October 7 and October 8, 2025, and involves alleged harm to the endangered Southern California Steelhead (steelhead) population caused by the California Department of Transportation (Caltrans).

The second cause of action against Caltrans is for a violation of Section 9 of the Endangered Species Act, 16 U.S.C. § 1538, arising out of steelhead take during work on U.S. Highway 101 in Gaviota Creek (the "Scour Repair Project"). Prior to beginning the Scour Repair Project, Caltrans did not engage in the consultation with the National Marine Fisheries Service (NMFS) generally required by 16 U.S.C. § 1536(a)(2). Instead, because the Scour Repair Project was designated as an emergency project, Caltrans proceeded with and completed the Project before engaging in after-the-fact consultation allowed by 50 C.F.R. § 402.05. Caltrans's work on the Project resulted in take of several steelhead through death and relocation. Plaintiff argues that

because Caltrans did not have an incidental take permit at the time the take occurred, Caltrans violated Section 9 of the Endangered Species Act.

On March 18, 2026, after the after-the-fact consultation process had been completed, the NMFS issued a Biological Opinion and Incidental Take Statement (BO/ITS) regarding the Scour Repair Project. The BO/ITS found that "the [Project] did not jeopardize the continued existence of the endangered Southern California . . . steelhead . . . or destroy or adversely modify its designated critical habitat." The BO/ITS further instructed Caltrans to continue with its already planned habitat restoration efforts to ameliorate any harm done by the Project.

Caltrans argues that the issuance of the BO/ITS moots Plaintiff's second cause of action because the BO/ITS provides after-the-fact take authorization for the killed and relocated steelhead. Therefore, because the take was authorized, Caltrans did not violate Section 9 of the ESA.

Plaintiff argues that take authorization occurring after take has already occurred does not shield Caltrans from Section 9 liability. In Plaintiff's view, an actor must have a take authorization at the time take occurs regardless of what NMFS might say following the after-the-fact consultation process.

The primary authority cited by Plaintiff is 16 U.S.C. § 1536(o)(2). Plaintiff contends that § 1536(o)(2) makes an incidental take statement "a condition precedent to the section 9 exception." Pl. Brief at 5. Section 1536(o)(2) states:

> [A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

16 U.S.C. § 1536(o)(2).

Contrary to Plaintiff's argument, the language of § 1536(o)(2) does not require an incidental take permit to be issued before the take

occurs.  Section 1536(o)(2) shields take from liability if the take "is in compliance with the terms and conditions specified in a written [incidental take] statement."  NMFS has now issued the BO/ITS which found that the Scour Repair Project complied with the requirements of the (later-issued) BO/ITS.  Nothing in the language of § 1536(o)(2) requires that the relevant incidental take statement be issued prior to the take so long as the take is in compliance with an issued incidental take statement at the time the ESA Section 9 question is considered.

After-the-fact take authorization also does not undermine the statute's purpose.  An after-the-fact incidental take statement indicates that a project, as implemented, took sufficient due care to avoid take, even if some take occurred.  This is no different in substance from a prospective take authorization where NMFS imposes conditions it finds to constitute due care.  There is no reason to find Caltrans liable where its actions complied with what, in substance, NMFS would have ordered anyway.  Plaintiff believes that Caltrans should be found liable despite both being excused from the before-the-fact consultation and having done an approximation of what NMFS would have ordered if that consultation had occurred before-the-fact.

Further, even if the after-the-fact BO/ITS did not strictly immunize the previous take, there is now no appropriate relief for the Court to order in this case.  Habitat restoration in the area of the Scour Repair Project is continuing, but, to the degree that Caltrans complies with the requirements of the BO/ITS, its restoration activities are all that is required by the ESA.  There is no basis for the Court to order actions above and beyond what is required by the BO/ITS and, by extension, the ESA.  See 16 U.S.C. § 1536(o)(2).

Plaintiff argues that the case is not moot because the Court could issue declaratory relief or, for similar reasons, argues that the case is not moot because Caltrans's acts are capable of repetition but evade review.  This argument is based on Plaintiff's claim that Caltrans has repeatedly abused the emergency project exception provided by 50 C.F.R. § 402.05 to avoid before-the-fact consultation on its projects.  To the degree that Plaintiff seeks a declaration that Caltrans repeatedly

3

abuses 50 C.F.R. § 402.05, (1) there is insufficient evidence in the record to make that finding, and (2) NMFS retains the authority to reject after-the-fact consultation if a project is found not to constitute an emergency, which would subject Caltrans to Section 9 liability if take occurred.  In this case, NMFS accepted that the Scour Repair Project was an emergency for the purposes of § 402.05 both prior to the work on the project and later during the consultation process.   And, to the degree that Plaintiff seeks a declaration that an after-the-fact BO/ITS does not eliminate Section 9 liability for take occurring before issuance of the BO/ITS, as discussed above, the Court disagrees with that analysis and will not issue such a declaration.

For the reasons stated above, the second cause of action for violation of Section 9 of the ESA is DISMISSED.

IT IS SO ORDERED.

Date: May 21, 2026

_____
Dale S. Fischer
United States District Judge

4

# ATTACHMENT 3

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COASTAL RANCHES CONSERVANCY, <br>     Plaintiff, <br><br> v. <br><br> TONY TAVARES, in his official capacity as Director of the California Department of Transportation, <br>     Defendant. | 2:24-cv-00468-DSF-RAOx <br><br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came before the Court for a bench trial on October 7 and October 8, 2025.  The parties subsequently filed post-trial briefs in favor of their positions.[1]  After hearing the testimony and reviewing the evidence and argument, the Court now finds as follows:

---

[1] While the Court's trial findings were under submission, the National Marine Fisheries Service issued a Biological Opinion and Incidental Take Statement (BO/ITS) regarding the project at issue in the second cause of action in this case.  The Court has dismissed the second cause of action in a separate order.

# I. Findings of Fact

1.  The Southern California Steelhead (steelhead) is a salmonid species that has been listed as endangered under the federal Endangered Species Act (ESA) since 1997.  Allen Decl. (Dkt. 118) ¶ 13.

2.  Steelhead are an anadromous species that return from the sea into freshwater rivers and streams in order to spawn.  Fish of the same species, *Oncorhynchus mykiss* (*O. mykiss*),[2] that remain resident in freshwater for their entire lifecycle are known as rainbow trout.  Id. ¶¶ 14; 29-30.

3.  Adult steelhead sightings in the Southern California region are rare.  Id. ¶¶ 20-24.

4.  Resident rainbow trout and steelhead can interbreed.  Whether the resulting fry are steelhead or resident trout cannot be determined until maturity.  DeVries Decl. (Dkt. 124-1) ¶ 35.

5.  The freshwater body at issue in this case, Gaviota Creek in Santa Barbara County, California, historically and currently provides habitat and spawning grounds for steelhead.  See, e.g., Allen Decl. ¶¶ 23, 28, 38-39, 45.

6.  However, recent sightings of steelhead in Gaviota Creek are very rare.  Id. ¶ 24.

7.  Numerous barriers, both natural and manmade, inhibit free upstream passage of some or all steelhead in Gaviota Creek.[3]

---

[2] The Court will use "steelhead," "juvenile steelhead," and "resident trout" when referring to those subgroups individually and "*O. mykiss*" when not differentiating among the subgroups.

[3] The Court refers to the Caltrans structures as "barriers" for ease of reference, not necessarily as a judgment on their effect on the movement of *O. mykiss*.

2

8. With one exception,[4] the manmade barriers in Gaviota Creek are owned and maintained by the California Department of Transportation (Caltrans) as part of U.S. Highway 101.  Fourteen Caltrans barriers are at issue in the case.

9. The two most relevant natural barriers in Gaviota Creek are the so-called "Bedrock Chute" and "Boulder Jam."

10. The Bedrock Chute is composed of two steep, narrow, smooth slopes with a resting pool in the middle.  DeVries Decl. ¶¶ 64-65. The structure of the Bedrock Chute results in high velocity water flow over a narrow shallow surface, which is very difficult for fish to pass.  Id.

11. The Boulder Jam is an eight-foot-high barrier with a bedrock ledge and no plunge pool at the base.  Id. ¶ 66.  Any fish attempting to go upstream of the Boulder Jam must make a very high jump without the benefit of a pool in which to rest and launch the jump.  Id. ¶¶ 66-69.

12. These two natural barriers lie between four Caltrans barriers downstream and ten Caltrans barriers upstream.  See Ex. 208.

13. Adult steelhead, juvenile steelhead, and resident trout have differing abilities to overcome barriers in a stream.  See generally Allen Decl. ¶¶ 142-151.

14. When analyzing the passability of the various barriers in Gaviota Creek, Plaintiff's expert, Mark Allen, utilized jump heights based on fish passageway criteria.  DeVries Decl. ¶ 39 (unrebutted).

15. The use of passageway criteria does not necessarily provide the most relevant estimate of jumping ability because passageway

---

[4] The barrier referred to as GA_14 is a utility crossing over Caltrans's right of way.  There is some dispute about the degree of control that Caltrans may have over this crossing.  Given the Court's findings, it is unnecessary to resolve this dispute and the Court will refer to the utility crossing as if it were a Caltrans-owned barrier.

3

construction seeks to provide easy paths for fish, not merely manageable ones.  See DeVries Decl. ¶¶ 39-44.

16. Testimony from both Allen and Defendant's expert, Paul DeVries, indicate that adult steelhead can jump well in excess of the two feet used by Allen in his calculations.  Allen testified that an adult steelhead can jump over five feet "in the right conditions."  Tr. 160:3-5.  DeVries testified that "a 5- to 8-foot leap is not uncommon" for an adult steelhead.  Tr. 424:13-17.

17. Based on that testimony, a reference jumping height of 4 to 5 feet for an adult steelhead is more appropriate than the two feet used by Allen.

18. Based on the information presented by Allen in Trial Exhibit 53, all of the Caltrans barriers other than the two culverts would be passable with a five-foot jump and all of the Caltrans barriers other than the culverts would be passable under favorable conditions with a four-foot jump.

19. Further, it is uncontroverted that any steelhead capable of passing the Boulder Jam would be almost certainly capable of surmounting all of the Caltrans manmade barriers between the natural barriers and the Las Canovas Culvert.

20. There is insufficient evidence to conclude that the cumulative effect of the Caltrans non-culvert barriers either meaningfully discourages or directly harms steelhead when moving upstream in Gaviota Creek.  Plaintiff's evidence on this point is speculative, and steelhead are known to migrate substantially longer distances over many more barriers.  See Tr. 424:24-426:4 (DeVries).

21. Very little testimony was provided regarding the jumping abilities of juvenile steelhead and adult resident trout beyond the passageway construction guidelines used by Allen.  What evidence there is suggests that both juvenile steelhead and adult

4

residents can jump at least one foot and probably more.  <u>See</u> Allen Decl. ¶¶ 144-148.

22. However, even assuming a two-foot jump height, several Caltrans barriers inhibit upstream movement for juvenile steelhead and resident trout.  All but one of the Caltrans barriers inhibit upstream movement if a one-foot jump height is used.  <u>See</u> Exhibit 53.

23. It is uncontroverted that juvenile steelhead and adult resident trout cannot pass upstream of the Boulder Jam.

24. It is probable that juvenile steelhead and adult resident trout cannot pass upstream of the Bedrock Chute.

25. It is uncontroverted that there is a population of resident trout already existing above the Boulder Jam.

26. Even if juvenile steelhead and resident trout cannot pass back and forth over the Boulder Jam, the upstream Caltrans barriers prevent fish already above the Boulder Jam from moving upstream above the Boulder Jam.

27. Juvenile steelhead and resident trout can benefit from being able to move up and downstream in response to stream conditions such as heat, food availability, and flow strength.  <u>See</u> Allen Decl. ¶¶ 103-106.

28. However, Plaintiff provided insufficient evidence for the Court to conclude that the benefit to juvenile steelhead and resident trout of being able to move upstream over the non-culvert barriers translates into an actual meaningful impact to the steelhead population.

29. While the Court appreciates that direct observation of *O. mykiss* in varying Gaviota Creek conditions could be difficult and resource intensive, Plaintiff has failed to provide an adequate assessment of the conditions between the Caltrans barriers.

30. For example, there is no evidence to indicate that certain parts of Gaviota Creek are lacking in quality deep pools, but adjacent areas upstream have pools that could be accessed if it were not for the Caltrans barriers.

31. Nor is there evidence that some parts of Gaviota Creek have minimal food availability but adjoining food-rich areas cannot be accessed due to the Caltrans barriers.

32. In the absence of this type of evidence, the Court is left with no way to conclude that movement of *O. mykiss* within the areas impeded by the Caltrans barriers would have an actual, substantial impact on the population.

33. It is also uncontroverted that Gaviota Lagoon remains in a relatively natural state, albeit substantially reduced from its original size by human activities.  Plaintiff acknowledges that Gaviota Lagoon provides high quality rearing habitat for juvenile steelhead.  Allen Decl. ¶¶ 124-131.

34. Plaintiff has failed to establish that Gaviota Lagoon and the interrupted stretches of Gaviota Creek downstream of the culverts fail to provide sufficient amounts of reasonably high quality habitat for resident trout and juvenile steelhead, especially given the very low number of steelhead currently in Gaviota Creek or likely to be resident in Gaviota Creek in the foreseeable future.

35. It is uncontroverted that the two Caltrans culverts are impassable to all adult steelhead, juvenile steelhead, and resident trout.

36. Therefore, the entire Gaviota Creek watershed upstream of those culverts is inaccessible to adult steelhead and to any juveniles or resident trout not already above the culverts.

37. However, there is little evidence from which to conclude that access to the habitat upstream of the culverts would have a meaningful impact on the steelhead population.

38. Plaintiff speculates that the headwaters of Gaviota Creek above the Giorgi Culvert contain high-quality habitat, but access to the private landholdings in the area is "highly restricted" and no evidence of the actual current conditions is in the record. <u>See</u> Allen Decl. ¶¶ 51-54.

39. There is some evidence that Las Canovas Creek upstream of the Las Canovas Culvert contains potentially good steelhead and resident trout habitat. <u>See</u> Allen Decl. ¶¶ 58-60. However, Plaintiff submitted very little evidence on this point, and the Court cannot conclude that access to the creek would provide a meaningful benefit to the steelhead population.

40. Plaintiff's expert conducted a "short inspection" of Las Canovas Creek "just upstream" of the Las Canovas Culvert, but from this he concluded only that the creek "appeared to possess the qualities" needed for spawning and rearing of *O. mykiss*. <u>Id.</u>

41. There is little evidence that Las Cruces Creek or the West Fork of Gaviota Creek would provide meaningfully helpful habitat for steelhead or resident trout populations.

42. Plaintiff's expert concedes that, if accessible, Las Cruces Creek would likely be "low quality" steelhead habitat. Allen Decl. ¶ 71.

43. While the West Fork can provide moderate to high quality habitat seasonally, Plaintiff's expert concedes that the West Fork is subject to intermittent flows and goes dry for part of the year. Allen Decl. ¶¶ 62-74.

44. The Court accepts that access to the West Fork could be marginally helpful to the *O. mykiss* population, all other things being equal, but it is  not convinced that access would make a significant difference to that population.

## II. Conclusions of Law

1. It is unlawful under the ESA to "take" an endangered species listed under the Act.  16 U.S.C. § 1538(a)(1)(B).

2. "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

3. "Harm" to a species includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.

4. "[A] citizen-suit plaintiff must prove that the injury to identifiable members of the protected species is of a type covered by the ESA and that the relationship between the challenged activity and the injury meet the standards of proximate causation."  Cascadia Wildlands v. Scott Timber Co., 105 F.4th 1144, 1156 (9th Cir. 2024).

5. It is not necessary that the degraded or destroyed habitat be "essential" to the survival of the listed species.  Id. at 1157.  The requirement is "that the habitat be *significantly* modified or degraded, and that the modification or degradation *significantly* impair the species' *essential* behavioral patterns."  Id. (emphasis in original).

6. Consistent with the above findings of fact, the Court concludes that the Caltrans barriers do not significantly impair the essential behavioral patterns of adult steelhead.

    a. Using an appropriate jump height of four to five feet, the Caltrans barriers downstream of the culverts are passable by adult steelhead under most flows.

    b. In addition, the natural barriers in Gaviota Creek, especially the Boulder Jam, are the most salient barriers to adult steelhead passage.  Any adult steelhead capable of

8

passing the Boulder Jam will be able to pass any Caltrans barrier downstream of the culverts.

   c. Any cumulative harm to adult steelhead from the need to pass the Caltrans barriers is speculative and unlikely to be significant based on the record before the Court.

   d. The Caltrans culverts completely impede the passage of all steelhead. However, Plaintiff failed to establish that lack of access to the habitat upstream of the culverts significantly impairs the steelhead population in Gaviota Creek or in Southern California more generally.

7. Consistent with the above findings of fact, the Court concludes that the Caltrans barriers do not significantly impair the essential behavioral patterns of juvenile steelhead or resident trout.

   a. The natural barriers completely impede passage of juvenile steelhead and all resident trout. Therefore, Caltrans barriers upstream of the natural barriers are irrelevant to any juveniles or resident trout already living downstream of the natural barriers.

   b. The Caltrans barriers may be detrimental to juvenile steelhead and resident trout by impeding those fish from freely moving up and downstream in response to cooling needs or differences in food availability. However, the evidence on this point lacked detail and was largely hypothetical. The Court cannot conclude that any disruption of movement within Gaviota Creek by the Caltrans barriers *significantly* impairs the ability of juvenile steelhead and resident trout to engage in essential behavioral patterns, such as eating and cooling.

8. Overall, while the Caltrans barriers may be less ideal for the *O. mykiss* population than an entirely natural, unimpeded Gaviota Creek would be, Plaintiff has not established that the barriers

have a significant, non-hypothetical, real-world impact on *O. mykiss* essential behavioral patterns.

9.  Therefore, the Court finds Caltrans not liable for the alleged violation of 16 U.S.C. § 1538 stated in the first cause of action in this case.

IT IS SO ORDERED.


Date: May 21, 2026

_____
Dale S. Fischer
United States District Judge

10

# ATTACHMENT 4

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL RANCHES CONSERVANCY, <br>    Plaintiff, <br><br>        v. <br><br> TONY TAVARES, in his official capacity as Director of the California Department of Transportation, <br>    Defendant. | 2:24-cv-00468-DSF-RAOx <br><br><br> JUDGMENT |

The Court having conducted a bench trial on October 7 and October 8, 2025, and having found in favor of Defendant Tony Tavares, in his official capacity as Director of the California Department of Transportation, and against Plaintiff Coastal Ranches Conservancy,

IT IS ORDERED AND ADJUDGED that Plaintiff take nothing, that the action be dismissed with prejudice, and that Defendant recover costs of suit pursuant to a bill of costs filed in accordance with 28 U.S.C. § 1920.

Date:  May 21, 2026

_____
Dale S. Fischer
United States District Judge